831 F.2d 118
 26 ERC 1673, 56 USLW 2241, 17 Collier
Bankr.Cas.2d 736,
Bankr. L. Rep. P 72,015, 18 Envtl. L. Rep. 20,013
 In re WALL TUBE & METAL PRODUCTS COMPANY, Debtor.
William L. LANCASTER, Plaintiff-Appellee,
v.
STATE OF TENNESSEE, on Behalf of TENNESSEE DEPARTMENT OF
HEALTH & ENVIRONMENT, Defendant-Appellant.
 No. 86-5963.
 United States Court of Appeals,
Sixth Circuit.
 Argued and Submitted Aug. 4, 1987.
Decided Oct. 14, 1987.
 
 W.J. Michael Cody, Atty. Gen. of Tenn., Nashville, Tenn., Michael D. Pearigen (argued), for defendant-appellant.
 Ferdinand Powell, Jr., Johnson City, Tenn., for plaintiff-appellee.
 Matthew Yackshaw, Canton, Ohio, for Wall Tube.
 Before KEITH, Circuit Judge, PECK, Senior Circuit Judge, and DOWD, District Judge.*
 KEITH, Circuit Judge.
 
 
 1
 This case concerns two federal statutes: the Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., and the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. Sec. 9601 et seq. CERCLA allows a state to recover all costs incurred by it in responding to the improper disposal of hazardous substances. See 42 U.S.C. Sec. 9607(a).[1] The statute makes the owner and operator of the disposal site, among others, liable for those response costs. 42 U.S.C. Sec. 9607(a)(1), (2). The issue before us is whether the response costs, recoverable by the State of Tennessee ("State") under federal law, are allowable as administrative expenses in a Chapter 7 bankruptcy proceeding. In proceedings before the bankruptcy court, the State filed a request and application for administrative expenses pursuant to 11 U.S.C. Sec. 503(b)(1)(A) and Sec. 507(a)(1) of the Code. The bankruptcy court denied the State's request.[2] The district court affirmed the bankruptcy court. We REVERSE.
 
 I.
 
 2
 Debtor Wall Tube and Metal Co. ("Wall Tube") occupied property in Newport, Tennessee under a twenty year lease. The company manufactured automobile bumpers, outdoor furniture, steel tubing and other metal fabrications on the leased premises. The company's manufacturing processes generated hazardous waste substances which were drummed and stored on the site. Sometime in October, 1983, Wall Tube halted operations and shut down the Newport facility. On December 8, 1983, an inspector for the Tennessee Department of Health and Environment ("TDHE") inspected the site and found that an open storage tank containing 1, 1, 1 tricholorethane was almost overflowing due to rainwater accumulation. The inspector also found several drums filled with lime sludge and "pickle liquor" (a substance containing hydrofluoric acid for the treatment of steel). These substances are defined as hazardous substances under CERCLA.[3] The inspector issued a notice of violation of the Tennessee Hazardous Waste Management Act of 1977 ("Tennessee Act"), Tenn.Code Ann. 68-46-101 et seq., and recommended that Wall Tube immediately dispose of the wastes on the site in a proper manner.[4] A subsequent inspection by the TDHE on February 1, 1984 found the situation basically unchanged.[5]
 
 
 3
 Wall Tube filed a voluntary petition in bankruptcy under Chapter 7 of the Bankruptcy Code on February 22, 1984. The trustee of the debtor's estate, William Lancaster, was notified of the hazardous substances and the violation of the State's environmental law by receipt of the TDHE February inspection report. On June 11, 1984, the State requested its standard hazardous waste removal contractor to inspect the facility and present a proposal for the facility's emergency clean-up.[6] The inspection, undertaken on June 15, 1984, revealed evidence of dumping or spilling of various wastes onto the ground and inside the buildings, the presence of non-hazardous and hazardous substances in drums inside and outside the buildings, tanks or vats containing sludges, a tank leaking a corrosive liquid, and bottles of nitric and hydrochloric acid. On July 23, 1984, the Chapter 7 trustee gave notice, pursuant to Bankruptcy Rule 6007, of his intent to convey most of the property to its original lessors, two corporations owned by a M.E. Bullard.
 
 
 4
 On November 9, 1984, the State authorized its contractor to sample and analyze the substances on the Wall Tube site. The contractor undertook the analysis in late November and late December of 1984. On December 3, 1984, the bankruptcy court approved the conveyance announced by the trustee in July. While the property transfer conveyed some of the hazardous substances, other drums and tanks containing hazardous wastes remained part of the debtor's estate.[7] The State's contractor submitted its reports from the 1984 analysis in January, February and April of 1985. According to an affidavit submitted by Margaret E. Dew, a chemist and staff member of THDE, the contractor's reports and the THDE's own inspection revealed that the drums still within the estate constituted up to four separate "threatened release locations" of hazardous substances. These substances, if contacted or inhaled, could have caused as many as fifteen different health hazards, including loss of consciousness, vomiting, internal organ damage, skin burns, birth defects and death.
 
 
 5
 On May 2, 1985, the State filed a formal request for administrative expense treatment of its expenses. After a hearing, the bankruptcy court denied the request, finding that the expenses were not "actual, necessary costs and expenses of preserving the estate" within the meaning of 11 U.S.C. Sec. 503(b).[8] The bankruptcy court also concluded that 28 U.S.C. Sec. 959(b), which requires a trustee to "manage and operate the property in his possession ... according to the requirements of the valid laws of the State ..." does not apply to a Chapter 7 trustee liquidating the estate.[9] The court held that since the State's activity neither benefitted the estate nor fulfilled a legal obligation under State law, the State's recovery costs could not be accorded administrative expense status.
 
 
 6
 The district court affirmed, relying on Midlantic National Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), to hold that 28 U.S.C. Sec. 959(b) does not apply to liquidation trustees. The State appeals.
 
 II.
 DISCUSSION
 
 7
 There are two interrelated issues that must be resolved in this case. First, we must determine if 28 U.S.C. Sec. 959(b) requires the Chapter 7 liquidating trustee of Wall Tube's estate to comply with the State's hazardous waste statute. If it does so require, we must then determine whether the response costs incurred by Tennessee were "actual, necessary costs and expenses of preserving the estate." See 11 U.S.C. 503(b)(1)(A).
 
 
 8
 Turning to the Sec. 959(b) issue first, we agree with the court in In re Peerless Plating Co., 70 B.R. 943 (Bkrtcy.W.D.Mich.1987), that "[a]ny discussion of this question of administrative expenses ... and ... hazardous wastes must begin with Midlantic." In Midlantic, a Chapter 7 liquidating trustee sought to abandon property containing waste oil contaminated with PCB, a highly toxic carcinogen.[10] The Supreme Court stated that "[n]either the Court nor Congress has granted a trustee in bankruptcy power that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." Midlantic, 474 U.S. at 502, 106 S.Ct. at 760 (emphasis added). The Court noted further that "Congress had repeatedly expressed its legislative determination that the trustee is not to have carte blanche to ignore non-bankruptcy law. Where the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety." Id. (emphasis added). The Court held that the trustee could not abandon property "in contravention of a state statute or regulation designed to protect the public health or safety from identified hazards." Id. at 507, 106 S.Ct. at 762.
 
 
 9
 Wall Tube violated the Tennessee Act's requirement of proper disposal and storage of hazardous wastes.[11] The violation was discovered before the bankruptcy petition was filed and continued after the Wall Tube trustee was notified. The Tennessee Act is, of course, one "designed to protect the public health or safety" from readily identified hazards. In this case, the hazards were identified by the THDE's series of inspections. Wall Tube's trustee, under those circumstances, could not have abandoned the property. If he had done so, the public would have been faced with the same threat the court in Midlantic sought to avoid--a continuing, potentially disastrous environmental health hazard with no one clearly responsible for remedial action.
 
 
 10
 It follows that if the Wall Tube trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have maintained or possessed the estate in continuous violation of that same law. Otherwise, the result avoided in Midlantic would (and in this case did) remain--an ongoing, potentially disastrous health hazard without remedy from those at fault. The only difference here is that the danger arose because of the trustee's and the debtor's failure to correct the violation, not because of the trustee's exercise of the abandonment power as in Midlantic. We find that difference, however, as unpersuasive as the difference between omission and action, especially when the deleterious effect on the public health and safety is the same.[12]
 
 
 11
 Nor are we convinced that Section 959(b) is inapplicable to liquidating trustees, as respondents argue. The Midlantic Court found that Section 959(b) supported its conclusion that the Bankruptcy Code does "not pre-empt all state laws that otherwise constrain the excuse of a trustee's powers." Midlantic, 474 U.S. at 505, 106 S.Ct. at 762. Furthermore, the Court noted Congress' intentions that the trustee's efforts "to marshal and distribute the assets of the estate" give way to the governmental interest in public health and safety. Id. at 502, 106 S.Ct. at 760. We believe that whether a trustee is liquidating, managing or reorganizing the debtor's estate, his efforts under the Code remain the same--the consolidation and distribution of the estate's assets to the benefit of the creditors. As such, that the trustee in this case is liquidating the estate rather than reorganizing it is inconsequential, especially in the critical context of the public's welfare. In either case, an environmental hazard on the estate's property is within the control of the trustee.
 
 
 12
 In a case decided before Midlantic, Ohio v. Kovacs, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Court stated that it did "not question that anyone in possession of the site--whether it is [the debtor] or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee--must comply with the environmental laws of the State.... Plainly that person may not maintain a nuisance, pollute ... or refuse to remove the source of such conditions." Id. 469 U.S. at 285, 105 S.Ct. at 711 (emphasis added). Just as plainly, Wall Tube and later its trustee should have complied with the State's hazardous substance laws. Since they did not comply, despite ample opportunity to do so both before and after the December, 1984 conveyance, the State was compelled to remedy the environmental health hazard at public expense.[13] We now turn to whether the expense incurred by the State was an actual, necessary cost and expense of preserving the estate.
 
 
 13
 As we noted earlier, the State is seeking recovery for its response costs from the debtor's estate under CERCLA's reimbursement provision, 42 U.S.C. 9607(a). CERCLA's unquestionably desirable "primary purpose is the prompt cleanup of hazardous waste sites." J.V. Peters & Co., Inc. v. Administrator, EPA, 767 F.2d 263, 264 (6th Cir.1985), citing Walls v. Waste Resource Corp., 761 F.2d 311, 318 (6th Cir.1985). We think it proper that the response costs incurred by Tennessee and recoverable under CERCLA be deemed an administrative expense. In Reading v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Supreme Court expanded the concept of administrative expenses to include damages resulting from the estate's post-petition negligence. The creditors argued then that making the response costs an administrative expense is unfair to the generally innocent creditors who suffer at the expense of the petitioner's higher priority claim. The Reading Court's response is applicable to this case: "Existing creditors are, to be sure, in a dilemma not of their own making; but there is no obvious reason why they should be allowed to escape that dilemma at the risk of imposing it on others equally innocent." Id. 391 U.S. at 482, 483, 88 S.Ct. at 1765. Indeed, the protection of innocent creditors would not be furthered by a contrary holding that permits creditors to benefit from their silence while the debtor violates the law. See U.S. v. Elliott, 761 F.2d 168 (4th Cir.1985).
 
 
 14
 Moreover, the Midlantic and Kovacs cases have created a special emphasis on the importance of complying with laws that protect the public health and safety. This emphasis has been noted in several cases. In In re Mowbray Engineering Co., Inc., 67 B.R. 34 (Bkrtcy.M.D.Ala.1986), the bankruptcy court permitted the Environmental Protection Agency ("EPA") to recover the cost of decontaminating property abandoned by the trustee as an administrative expense, holding that the power of the trustee "must yield to governmental interests in health and safety, which includes using assets of the estate for the necessary cleanup." Id. at 35 (emphasis added). In another case, In re Vermont Real Estate Investment Trust, 25 B.R. 804 (Bkrtcy.D.Vt.1982), the court treated as an administrative expense the expenses incurred by a municipality in removing a dangerous building from the premises of a leasehold of the estate. The court found that "the work ordered and subsequently performed by the [City] was not only necessary for the preservation of the leasehold as part of the debtor's estate but it was also a matter of necessity for the safety and welfare of the public in general." Id. at 806 (emphasis added).
 
 
 15
 The bankruptcy court in In re T.P. Long Chemical Inc., 45 B.R. 278 (Bkrtcy.N.D.Ohio 1985), determined that the EPA's costs of responding to a release of a hazardous substance were administrative expenses. The Long court stated that "[t]he congressional policy underlying CERCLA is that those who generate, use or transport hazardous material should be required to pay the cost of damages caused by the hazardous materials.... Congress has provided that this liability cannot be transferred...." Id. at 286. In a fact pattern markedly similar to this case, the Long court found that the CERCLA provisions were "enacted to protect the public from hazardous waste damage." The Long court concluded that "[s]ince the estate cannot avoid the liability imposed by CERCLA, it follows that the cost incurred ... in discharging this liability is an actual, necessary cost of preserving the estate entitled to administrative expense priority." Id. (emphasis added).
 
 
 16
 We believe the above-cited authority to be persuasive. It is undisputed that the hazardous wastes still within the debtor's estate after the 1984 conveyance presented a danger to the public's health and safety. The State of Tennessee, in the absence of compliance by the debtor's estate, was entitled by its own law to expend funds to assess the gravity of the environmental hazard. We thus find those expenses to be actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public.
 
 
 17
 We therefore REVERSE the decision of the Bankruptcy and District Court below, REMAND the case to the Bankruptcy Court and direct the Bankruptcy Court to enter an order granting the State of Tennessee's request seeking the response cost of $23,670.21 as an administrative expense.
 
 
 
 *
 Honorable David Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Section 9607(a) states:
 (a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 (1) the owner and operator of a vessel ... or a facility,
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
 (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.
 
 
 [2]
 See In re Wall Tube and Metal Products Co., 56 B.R. 918 (Bkrtcy.E.D.Tenn.1986)
 
 
 [3]
 CERCLA defines hazardous substances, in part, by reference to hazardous and toxic wastes and pollutants as defined by other federal environmental laws. 42 U.S.C. 9601(14). This section provides, in pertinent part, that a hazardous substance includes:
 * * * (A) any substances designated pursuant to Section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substances designated pursuant to Section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to Section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under Section 1317(a) of Title 33 * * *.
 See also 40 C.F.R. 261.31--at F001, F002; 40 C.F.R. 261.32--at K062; and see 40 C.F.R. 261.22 and 261.24.
 
 
 [4]
 Though the violations were of state environmental law, the State seeks recovery under the response cost provisions in the federal statute, 42 U.S.C. Sec. 9607(a). See New York v. Shore Realty Corp., 759 F.2d 1032, 1041 (2d Cir.1985)
 
 
 [5]
 An affidavit by the THDE inspector, Richard S. Brown, states that on the December 8, 1983 inspection, Robert M. Kisabeth, Vice-President of Wall Tube, told Brown that an arrangement with a third party existed to dispose of the hazardous wastes. The record indicates, however, that this arrangement was never utilized, nor were the wastes removed until December, 1985, and only then by a contractor hired by the lessors of the premises
 
 
 [6]
 Pursuant to the Tennessee Act, the State may use state funds for the purpose of identifying and investigating inactive hazardous substance sites. See Tenn.Code Ann. Sec. 68-46-205(a)
 
 
 [7]
 The response costs for which the State submitted proof (totalling $23,670.21) were incurred in connection with the items that remain in the debtor's estate
 
 
 [8]
 11 U.S.C. Sec. 503(b) states in pertinent part:
 (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including--
 (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....
 
 
 [9]
 28 U.S.C. Sec. 959(b) states:
 (b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.
 
 
 [10]
 A trustee's power to abandon is codified at Sec. 554(a) of the Bankruptcy Code, 11 U.S.C. Sec. 554(a)
 
 
 [11]
 Wall Tube does not dispute its liability under the Tennessee Act, nor does it dispute its liability under 42 U.S.C. Sec. 9607(a)
 
 
 [12]
 See In re Peerless Plating, 70 B.R. 943 (Bkrtcy.W.D.Mich.1987) for a similar analysis
 
 
 [13]
 Our holding that the trustee should have complied with the Tennessee Act does not mean that all trustees must comply with all state statutes protecting the public health and safety. The Midlantic opinion leaves open numerous lines of inquiry which the bankruptcy court can follow to assess a law's effect on the adjudication of the bankruptcy. See Midlantic, 474 U.S. at 505, 106 S.Ct. at 762 ("The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon ... in contravention of a state statute ... reasonably designed to protect the public health....") (emphasis added). See id. at 507 n. 9, 106 S.Ct. at 762 n. 9; cf. In re Peerless Plating, 70 B.R. 943 (Bkrtcy.W.D.Mich.1987) (Midlantic requires a bankruptcy court to apply a three step test before an estate is compelled to comply with a state law designed to protect the public safety)